Good morning, Your Honor. My name is Lynn Ball and I represent Salvador Pacheco-Garcia. On February 13, 2010, Pacheco, my client, was a passenger along with his daughter who was in the backseat of this car. Mr. Pacheco was not driving the car because his license was suspended. The car was in his wife's name. Mr. Pacheco had purchased the car. The co-defendant, represented by Mr. Cortez, was driving the automobile. This automobile was a late model Chrysler Pacifica. Chrysler Pacifica is sort of a combination of a minivan and a station wagon. It's not as large as a minivan and perhaps not as small as a small station wagon. They were proceeding on Interstate 5, just about 5 or 6 or 7 miles south of the checkpoint which is set up on Interstate 5 between San Diego and Los Angeles. However, the checkpoint was not in operation. Therefore, the actions of the officers in this case would fall under the rules necessary for what they call a robing patrol, which means that in order to make a stop, as was the case in the last, as it was the law in the last case, there has to be reasonable suspicion that there's criminal activity at foot. The officers were sitting at an angle to the northbound freeway and observing the traffic go by. They had been there for about 20 minutes, as I recall, when Mr. Pacheco, the passenger in the vehicle being driven by Mr. Barrero, went by. During the evidentiary hearing, the officer who was the senior officer in the vehicle said, I made my decision, meaning I made my decision to go investigate and chase the White Pacifica when it passed my location and I saw the behavior of the passenger and the markings on the side with the dirt and the lack of license plate. Now, the behavior of the passenger was that he looked at the white pickup truck. Now, this was not an obvious marked Homeland Security or Border Patrol vehicle. It did have a strange sort of rack on the back, but it was not the green and white vehicle that you typically see. It was not obvious that it was a Border Patrol vehicle. Now, while it was not obvious that it was a Border Patrol vehicle, that vehicle with the red rack vehicle was headed north. This vehicle was headed in a southwesterly direction. And so, didn't you think that if you were driving and you see someone off to the right on the shoulder, and it didn't look like a police vehicle or whatever, and it parked that way, you'd be wondering, well, what are you doing there? Why do you park there? Why do you park there either? And so you were thinking, well, I'm looking over there, and I'm going to park there and determine if that was a crime? Well, my point was it wasn't a marked vehicle. I don't know what a person would think looking at the vehicle. They may think it's a Border Patrol vehicle or some sort of law enforcement. I don't know, Judge Patterson. Well, I wonder when they're still working on it. Well, I don't know. Well, you don't know one way or another. That's correct. Any time you see a vehicle parked along the right shoulder, you're going to look at it. People are curious. That's what they call looking at you. And not only is it parked on the shoulder, but it's parked and headed in the wrong direction. So, I don't know why that's so fascinating. Did you diagram the positions of these vehicles? Yes, sir. Judge Patterson, I said, did you? Did you diagram the positions of these vehicles? I believe that was the question. For the purpose of the brief, I did not, no. And it was not diagrammed during the evidentiary hearing. But I am out of my five minutes. I'm going to let Mr. Cortez address the court. Thank you. May it please the Court, Ezequiel Cortez for Barrera Moreno. Judge Patterson, Justice Patterson, your question or comments, I believe, are very appropriate. You have a minivan, a family van, traveling north on a Saturday morning at 1130 in the morning, and what do you see? You see this big white F-150 truck with a shiny bed on it, facing the wrong way at a 45 degree angle at oncoming traffic. The oncoming traffic is traveling at 65 to 85 miles an hour. Any decent human being would have looked to the right, stared at that truck, and looked to the agents who were thinking subjectively, suspicious. The Fifth Circuit said in 1977, United States v. Lopez, riding high, riding low, as searching we will go. In saying that, I took five seconds. I practiced, trust me. The agent in this case said, under oath, that between the first point when he saw that van coming up north, five seconds elapsed until it passed their position, and in those five seconds, they made the decision to go chase that van in an unmarked F-150 white shiny truck. They had to speed up to catch up to it, 65 to 85 miles an hour, and at the same time, the van passed them at approximately 33 yards, almost half a football field. And in that distance, in that little time, these agents, with their experience, their vast experience, saw a little tiny speck of dirt or mud on the right lower fender of the van. Now, the totality of the circumstances in this case is what matters, and you have other cases to show the variety of circumstances that officers have to see every day. RVs will tell us what we're supposed to do in these cases. You take them one case at a time. What are the totality of the circumstances? First, because I have very little time, let me hurry a little bit. The district court's findings of fact are consistent with the facts provided by Mr. Barbara. So here in this case, you do not have a situation where we have to somehow distinguish the court's finding or say that they were clearly erroneous. What are the facts? Number one, what I just said about the van. When the officer testified at the hearing that the passenger stared at him suspiciously and then stared away from him, what a cross-examination he admitted was, he didn't even notice whether the person was wearing sunglasses. He didn't even notice his facial features or anything like that. He simply then said, well, he sort of looked at our direction and then abruptly looked up. That's five seconds. That's what anyone would have done. And that's it. When the van passed the officer's position on cross-examination, it came out that no officer had seen the lack of a license plate or a permit. In your briefs, do you rely heavily on Sigmund Ballesteros? Absolutely, Your Honor. Okay. And you argue that in that case the court, well, in arguing here, that the court should not have relied on Agent Tobin's testimony that Pacheco, Mr. Pacheco was driving erratically. But in Sigmund Ballesteros, there was no evidence that the defendant had broken any traffic laws in making. Good point. So in Sigmund Ballesteros, you had a marked patrol unit. What we have here in footnote 3 of Sigmund Ballesteros tells you the whole case because in the Sigmund case, this court would have decided it the same way, I'm convinced. What do they say in Sigmund Ballesteros footnote 3? When you're traveling on the road, 1130 on Saturday, you see this white van weaving in and out of traffic dangerously. To your right first and then to your left, what do you do? The California DMV driver manual tells you what to do. You look in the rearview mirrors, which is what the officers testified happened. That was somehow suspicious, okay? And then you do lane changes to get away from the tailgater. And that's exactly what Sigmund Ballesteros tells us should be done in this case. We don't have a marked unit. We don't have any of the other suspicious activity in any of the other cases. That's what the district court said to herself. This is a very close case. Indeed, it is. So what do you have after the van passes at 33 yards away in 5 seconds, the lane changes. That's all you have. Sigmund Ballesteros footnote 3 tells you that's innocent activity. And also because the officers cannot create the very exigency they want to use to bootstrap their founded suspicion. Their founded suspicion must be reasonable and objective. It cannot be subjective simply because they have experience and they believe that that's criminal activity. Thank you. Thank you. All right. All right. We'll go to court. We'll go to Mr. Manahan. Mr. Manahan, please proceed. Thank you. You're Mr. Manahan? Yes, George Manahan of the United States, may it please the Court. Uh-huh. First, both defendants object to a number of the factual determinations made by the district court, which must be reviewed for clear error. Most important of which, from what I've heard today, is whether or not there was erratic driving that was initiated by the driver, defendant Mr. Barrera. The district court clearly stated that it credited Agent Tobin's testimony regarding the erratic driving and evasive driving that Mr. Barrera initiated. Okay. You just used those words interchangeably. And is that what they've said, evasive or erratic? And is there not a difference? There is a difference between erratic and evasive driving. Okay. But I believe that Agent Tobin used both terms in his testimony. But the more important one, I think, is evasive. I think we've heard a lot, and there's been two similar cases before this Court, heard a lot about, you know, whether a car is driving fast, whether it's changing lanes. But I think the most important point is you see a border patrol agent, and that's when your driving starts changing. You're trying to get away from border patrol. This is what distinguishes it from what maybe some people might do with a law enforcement officer versus someone carrying 35 pounds of methamphetamine. In my review, I didn't see any clear sign of it. I mean, where was it that it was discussed, you know, there was evasive behavior or obvious attempts of evasive behavior? Because I do know that there was a lot of references to erratic driving, but I didn't know that that translated. And maybe you can help me by pointing that out where the... If I don't find the word evading, I will certainly, if I'm allowed to, send the court, because I'm quite sure of it, that Agent Brera says, in my opinion, they were trying to get away from me. And when was that, in what context, when he said that because he was driving erratically? And I tried to divide up the number of factors that the agents relied upon in their totality of circumstances to pull over the vehicle. And so basically three. There's the initial observations after they cross. Then there's some observations when they're driving near, and then there's the erratic and evasive driving that occurs. So this occurs... This is erratic and evasive driving, and I really think it's key... I really think both occur here, and it's appropriate to say both. Okay. Tell me why. I think it's pages 110 through 111 of Brera's excerpts of records. Which says what? Okay. How would you describe the driving styles you're following? And key to this is, you know, when they first pass, the testimony is they look over. And although Judge Pragerson talked about the fact that it's an unmarked car, they're both in full uniform. And before this driving occurs, they had pulled up along the passenger side. The checker looks over to them again in full uniform and then tries to hide behind the car. And that's the point where the driving we're talking about starts. And then he says, how would you describe the driving? A lot of abrupt lane changes. It really didn't flow with traffic. There were a few lane changes that he made that were erratic, not singling. Didn't look. Just swooped across the lanes. No. And this is on line 23, page 110. And based on your experience, would you consider that a normal lane change? No. It appeared to me that all the lane changes were evasive. So we have both erratic and evasive driving going on. But, again, I think the more important ones. Let me ask you this. It seems to me that some of this erratic driving is performed by the unmarked service patrol vehicle. It was stationed in the opposite direction. They would come streaking along a counterclockwise, across two lanes of traffic, just behind the center of the vehicle, which is the third lane. And then swooped over to the lane just to the right of the center and looked at the passenger. And the passenger looked like he had jumped out of the car and the passenger leaned back on his feet. And then they came around again and went behind the passenger's vehicle and came up on the far right lane. And they took a look at the driver. And the driver was taking some water. And then they noticed that the service patrol vehicle had pulled over. Yes. And I have two points to make about that, Judge Pragerson. First, yes, there was a definite one of the points in the evidentiary hearing that he said was something. You see, our diagram is two dots. And one of the great lawyers that I've known and I knew him from the first day that he stepped into the courtroom was Steve Cox, one of our senior judges. And he diagrammed every case that we ever had. And I think a diagram would have been very helpful to the United States in this case for this reason, Your Honor. Well, first I want to say that the question of whether the erratic driving that defendants engaged in was initiated by the Border Patrol or not was squarely before the district court. She had the declarations from defendants saying, hey, we were just trying to get away with them. And then they had the testimony of Border Patrol Agent Tobin who said, I didn't do anything that would make anyone think that I was trying to sideswipe them or do anything to make people think I was doing evasive. So the actual determination was made by the district court that it was not initiated by Border Patrol. You listen to me when you're in that far right lane, that is in the wrong direction. And then you sweep across the lane and you get up close to the beautiful virtue. And then you sweep over the right lane and you back off. You don't consider that erratic driving? No, and this is a very important point. The point at which they said the erratic and evasive driving started from the defendants was, well, it was at least a minute, we'll say, for sake of argument, after they passed the parked Border Patrol truck on the side of the road. So presumably they get a little bit ahead. Yes, the Border Patrol truck has to speed up a little bit to catch up. But at the point the erratic and evasive driving started, all that had happened was they had followed behind them. They don't get a little bit ahead, do they, because they see what's beautiful? I mean, they're driving. They're driving with the flow of traffic until they get ahead. And so it's the vehicle, the Border Patrol vehicle that moves in the wrong direction, sweeps behind traffic on a very spaced maneuver, I would say. No, that's not correct. And gets close to their tail. And, well, you know, it started with that. And, you know, another thing, you know, one thing seems to be clear. Then we had a nice clean red car. And in our case, his case, we had a white Chrysler. And there was some dirt just to the rear of the white truck. And so in one case, we had a big suspicion that it was clean. In another case, we had a big suspicion that it was a little dirty. So I was there. Very quickly. I had a dirty car. All that had occurred before the erratic invasive driving was the Border Patrol agent caught up, driven behind the defendants for a while, and then pulled over towards the right side. The erratic invasive driving started before they had gone over to the driver's side of the vehicle. The dirty spot was important because in the agent's experience, he thought that it was indicative of a recent border crossing because at the borders, they sometimes quickly clean the cars, and it looked like someone had cleaned the car and missed a spot. I just have one last question because I asked about Sigmund Ballesteros. How do you distinguish this case from Sigmund Ballesteros? I think it's easily distinguishable. In Sigmund Ballesteros, it appeared that the court said the agent basically tailgated the car and all the car did was change lanes and slow down. Very different than what happened here. Here we have multiple lane changes, including some two lane changes at once without looking, and the key in Sigmund Ballesteros, page 1122, no. 2, they said the agent never testified the defendant was driving erratically or evasively. And as I just pointed out on page 110 of Barrera's excerpts of records, we have both of those testimonies here. And in fact, the Sigmund Ballesteros court said, hey, if he had driven erratically and evasively, then he would have had some reasonable suspicion, the exact thing we have here. All right. Thank you very much. Oh, I'm sorry. One question. Does the record reflect when you mentioned the officers were fully uniformed and impliedly the people in the white Chrysler could recognize them as law enforcement officers, were they wearing any headgear, smoky, the bear hats, or anything that would be clearly identifiable? I don't believe there's anything in the record regarding hats. But even if there was a question as to whether they saw the full uniform at the side of the road, before the erratic and evasive driving occurred, the border patrol agents had pulled over to the passenger side, and the evidence was Pacheco looks over and then starts hiding back. I mean, at that point, you could see the green uniform. All right. Thank you very much. The case is now split. Did you hear? I'm sorry. Is that right? Okay. Okay. Give me one minute. One minute. Your Honors, there is no indication on the record at all whether the driver of the van noticed those uniforms in the border patrol agents. In fact, the difference here that we have, and you cannot distinguish Sigmund by hysteresis, the driver of this van did not know, based upon the record we have, that this was a law enforcement vehicle, so you don't have evasive maneuvering. What happened the moment that red light went on in this case? The officer testified directly on direct examination. The driver of the van immediately complied, pulled over to the side of the road, and stopped, because that was the very first time the driver knew there were possibly officers in there. So we don't have evasive maneuvering, and there was no way by this driver to know who was driving that white truck. Thank you. Just one question. Did the district court accept that it was the – didn't it find the agent's testimony credible when it said that there was evasive maneuvers? The district court found the officer's testimony credible. If you look at maneuvering by the car, it's uncontested by us. We are relying on footnote three of Sigmund Ballesteros that the government didn't even mention. In Sigmund, footnote three, the court basically said when you have erratic, erratic maneuvering lane changes, that could be due to a reaction to the people – the tailgater, if you will. And that's what we have here. The district court never made a finding one way or the other. When you look at the declarations from Barrera-Moreno and her findings of fact, they mesh together perfectly. There is no dispute in fact. Thank you. Thank you. Thank you. The case is now submitted. We're ready to proceed with the case of United States v. Omar Ortiz-Flores.
judges: Conlon, Pregerson, Murguia